**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

|                                        |   |                        |
|----------------------------------------|---|------------------------|
| ROBERTA G. YARRUSSO,                   | ) |                        |
|                                        | ) |                        |
| Plaintiff,                             | ) |                        |
|                                        | ) |                        |
| v.                                     | ) | C.A. No. 18-cv-1439-MPT |
|                                        | ) |                        |
| NANCY A. BERRYHILL[1],                 | ) |                        |
| Acting Commissioner of                 | ) |                        |
| Social Security,                       | ) |                        |
|                                        | ) |                        |
| Defendant.                             | ) |                        |
|                                        | ) |                        |

**MEMORANDUM**

## I.      INTRODUCTION

This action arises from the denial of plaintiff's claims for Social Security benefits

under Title II of the Social Security Act ("the Act").[2]  On April 30, 2014, plaintiff filed a

Title II application for Social Security Disability Insurance Benefits ("DIB")[3]  and Disabled

Widow's Insurance Benefits ("WIB").[4]  Plaintiff alleged she became disabled on May 7,

2013,[5] through her last date insured, December 31, 2018.[6]  Plaintiff's prescribed period

for WIB began on April 7, 2014, the date of her husband's death.[7]  Plaintiff's alleged

disability is due to Systematic Lupus Erythematosus ("Lupus"), Polyarthralgia,

---

[1] Andrew Saul replaced Nancy Berryhill as the Acting Commissioner of Social Security as of June 17, 2019.
[2] 42 U.S.C. §§ 401-434.
[3] D.I. 6-5 at 317-319.
[4] *Id.* at 325-326.
[5] D.I. 6-6 at 347.
[6] *Id.* at 338.
[7] D.I. 6-5 at 317.

Fibromyalgia, Chronic Obstructive Pulmonary Disease ("COPD") and Emphysema, Muscular Degeneration, Anxiety and Depression.[8]  The claim was initially denied on November 10, 2014, and upon reconsideration on August 4, 2015.[9]  Following these denials, plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on September 18, 2015.[10]  The hearing occurred by video conference on April 2, 2017.[11]  Plaintiff appeared in New Castle, Delaware, and ALJ C. Howard Prinsloo participated from St. Louis, Missouri.[12]  Testimony was provided during the hearing by an impartial vocational expert ("VE"), Pamela Tucker.[13]  On September 7, 2017, ALJ Prinsloo issued a written decision denying plaintiff's claims.[14]  Plaintiff's request for review of the ALJ's decision by the Social Security Appeals Council was subsequently denied.[15]  On September 17, 2018, plaintiff filed a timely appeal with this court.[16]  Presently before the court are the parties' cross motions for summary judgment.[17]  For the foregoing reasons, the court will grant plaintiff's motion, and deny defendant's motion.  The court reverses the ALJ's decision and remands this case for further proceedings consistent with this decision.

---

[8] D.I. 6-7 at 394.
[9] D.I. 6-2 at 12.
[10] *Id.* at 74-75.
[11] *Id. at* 37-71.
[12] *Id.*
[13] *Id.* at 66-68.
[14] *Id.* at 12-27.
[15] *Id.* at 1-5.
[16] D.I. 1.
[17] D.I. 12; D.I. 20.

## II.    BACKGROUND

Plaintiff was born on November 21, 1956.[18]  She completed college, achieving a bachelors degree in human resources.[19]  Plaintiff was widowed on April 7, 2014 when her husband committed suicide.[20]  She began receiving Widow's Benefits when she reached the age of sixty.[21]  Plaintiff previously worked as a human resources manager, human resources representative, and event planner.[22]  She worked at Household Finance Corporation ("Household Finance"), as a human resource manager for seventeen years.[23]  Plaintiff ended employment with Household Finance to start an event planning business.[24]  Plaintiff was self-employed through her business for four to five years in which she planned events, including weddings, picnics, and town hall meetings.[25]  Plaintiff subsequently worked for Boeing as a human resources representative.[26]  She was terminated from Boeing in 2013 and has not worked since her termination because of her alleged disabilities.[27]

Plaintiff alleges she is disabled under the Social Security Act.[28]  To be eligible for disability benefits under the Act, plaintiff must demonstrate that she is disabled within the meaning of §§ 216(i), 223(d), and 202(e).  Plaintiff must meet the insured status

---

[18] D.I. 6-5 at 325; D.I. 6-2 at 44.
[19] D.I. 6-2 at 45.
[20] *Id.*; *see also*  D.I. 6-5 at 317.
[21] *Id.*
[22] *Id.* at 46-49.
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] D.I. 1.

requirements of §§ 216(i) and 223. Plaintiff has sufficiently met the requirements for coverage under §§ 216(i) and 223, and her earnings records show that she has acquired sufficient coverage to remain insured through December 31, 2018.[29] Additionally, under 202(e), plaintiff must show that she is a widow of a deceased worker, has attained the age of fifty, unless one of the exceptions in 20 C.F.R. 404.335(e) apply, and has a disability that began before the end of the prescribed period. The plaintiff has met the non-disability requirements for WIB as per § 202(e) of the Social Security Act.

## A.    Evidence Presented

Based on the evidence presented, the ALJ found that plaintiff has the following severe impairments: Lupus, Polyarthralgia, Fibromyalgia, and COPD.[30] However, the ALJ concluded that plaintiff's remaining physical impairments, including Muscular Degeneration, Fatty Liver Disease, Cholesterol, and Acid Reflux, are non-severe or not medically determinable.[31] In support of this finding, the ALJ determined that the remaining physical impairments "have been responsive to treatment, cause no more than minimal vocationally relevant limitations, have not lasted or are not expected to last at a severe level for a continuous period of twelve months, are not expected to result in death, or have not been properly diagnosed by an acceptable medical source."[32]

Finally, the ALJ found that plaintiff's medically determinable mental impairments of affective and anxiety disorders, considered independently and in combination, do not cause more than minimal limitation on her ability to perform basic mental work activities

---

[29] D.I. 6-2 at 12; *Id.* at 14.
[30] *Id.* at 15.
[31] *Id.*
[32] *Id.*

and are therefore non-severe.[33]

## 1. Physical Impairments

Plaintiff's disability report dated July 7, 2014, alleges disability due to Lupus, Polyarthralgia, COPD/Emphysema, Anxiety and Depression, Fibromyalgia, and Macular Degeneration.[34] The ALJ also considered plaintiff's disability report dated September 27, 2012, which alleged disability due to Connective Tissue Disease, Lupus, Fatty Liver Disease, Chronic Fatigue, Arthritis, Depression, Memory Loss, Cholesterol, Acid Reflux, and Lyme's Disease.[35]

### a. Non-Severe Medical Conditions

In his decision, the ALJ considered plaintiff's Macular Degeneration, Fatty Liver Disease, Cholesterol, Acid Reflux, and Lyme's Disease, in addition to her severe medical impairments.[36] Regarding plaintiff's complaint of Macular Degeneration, at the time of her amended alleged onset date, her optometrist's treatment plan was to continue observation.[37] Subsequently, during a consultative examination with Irwin Lifrak, M.D., in August 2014, his examination found 20/25 right eye and 20/30 left eye visual acuity.[38] Additionally, there was no evidence of visual field deficits when tested by gross confrontation testing method.[39] Plaintiff has not sought ongoing treatment for her alleged macular degeneration during the period of claimed disability.

---

[33] *Id.* at 15-16.
[34] D.I. 6-7 at 394.
[35] *Id.* at 458.
[36] D.I. 6-2 at 15.
[37] D.I. 6-9 at 569-573.
[38] *Id.* at 559.
[39] *Id.*

Regarding her Fatty Liver Disease, Cholesterol, Acid Reflux, in a history and physical report in November 2015, Sandra Mancilla, M.D., recommended a low fat diet and cardiovascular exercise, various blood tests, and prescribed Pravastatin.[40] Additionally, Dr. Mancilla prescribed Omeprozole for Gastroesophageal Reflux Disease (GERD).[41] In March 2016, Dr. Mancilla noted plaintiff's elevated blood pressure and advised her on a low sodium diet, monitoring her blood pressure, and continued with the prescribed medications.[42] Dr. Mancilla further reported that plaintiff's GERD was stable on medication.[43]

Plaintiff was diagnosed with Lyme Disease in June 2012.[44] At the hearing, plaintiff testified that she cannot distinguish the Lupus versus Lyme symptoms; however, she testified that her neurological issues are related to the Lyme's.[45] As **the ALJ noted,** the record lacks documented treatment or complications specifically due to her Lyme Disease.[46]

### b. Severe Medical Conditions

The ALJ found the following impairments to be severe: COPD, Lupus, Fibromyalgia, and Polyarthralgia.[47] Plaintiff's complaints began in 2011 with fatigue,

---

[40] D.I. 6-16 at 1142.
[41] *Id.*
[42] *Id.* at 1145.
[43] *Id.*
[44] D.I. 6-9 at 563.
[45] D.I. 6-2 at 554.
[46] *Id.* at 15.
[47] *Id.*

6

patchy alopecia, and pain in her hands, wrists, elbows, ankles, feet, and knees.[48] Plaintiff was subsequently diagnosed with Lupus, Polyarthralgia, and Lyme Disease in June 2012 and began oral medication treatment via Plaquenil.[49]

The plaintiff was prescribed a myriad of medications for her conditions, including but not limited to, Gabapentin, Leflunomide, and prednisone.[50] Subsequently, in January 2015, plaintiff reported that her pain and fatigue had improved.[51] She began pain management treatment and was prescribed Fentanyl in addition to her Oxycodone for pain.[52] Subsequently, plaintiff began Benlysta infusion treatments for Lupus beginning in September 2015 through 2017.[53] In November 2015, plaintiff's symptoms began to improve from the Benlysta treatment, with no new complaints of infection, swollen joints, rashes or oral sores, as well as weight loss or excess fatigue.[54] Dr. Javed noted on November 25, 2015, that the "Benlysta has helped her and her [pain] level has not returned to unbearable levels."[55]

Additionally, spirometry results from 2012 show mild obstructive pulmonary impairment, while chest imaging from the same time period revealed diffuse bilateral emphysema in her lungs.[56] Following her amended alleged onset date, plaintiff's complaints continued, and in September 2013, chest imaging confirmed emphysema.[57]

---

[48] D.I. 6-10 at 635.
[49] *Id.* at 639; D.I. 6-11 at 751-753; *Id.* at 784-786.
[50] D.I. 6-11 at 718.
[51] *Id.* at 717.
[52] *Id.* at 733.
[53] D.I. 6-14 at 955-971;D.I. 6-17 at 1262-64.
[54] D.I. 6-16 at 1213; D.I. 6-14 at 943.
[55] D.I. 6-14 at 943.
[56] *Id.;* D.I. 6-13 at 873-896.
[57] D.I. 6-10 at 660-686.

In May 2013, plaintiff underwent nocturnal oximetry testing which revealed that her oxygen saturation level was less than 90% for over six hours.[58] Subsequently, she was diagnosed with sleep apnea and emphysematous changes via imaging.[59] Her COPD and two lung nodules were noted by her pulmonologist to be clinically stable and that she has responded well to oral and inhaled medication.[60] In July 2017, plaintiff was seen by a pulmonologist for a COPD follow-up who noted that her oxygen saturation was at 95%.[61] Her pulmonologist again concluded that her COPD was clinically stable, with significant nocturnal hypoxemia caused by COPD and sleep apnea.[62] Her treatment plan included use of a Continuous Positive Airway Pressure (CPAP) therapy, or oxygen therapy if she could not tolerate the CPAP.[63] She was also referred for lung cancer screening.[64]

### 2. Psychiatric Conditions

Treatment records prior to plaintiff's alleged onset date show complaints of anxiety and depression.[65] On November 29, 2012, plaintiff underwent a Psychiatric Consultative Examination by Ramnik Singh, M.D.[66] Plaintiff was also diagnosed and treated by her treating psychologist, Mario Frabizzio, Jr., Ph.D.,[67] and psychiatrist,

---

[58] D.I. 6-17 at 1223.
[59] D.I. 6-11 at 736.
[60] *Id.* at 737.
[61] D.I. 6-17 at 1221.
[62] *Id.* at 1223.
[63] *Id.* at 1224.
[64] *Id.* at 1223.
[65] D.I. 6-13 at 907-921.
[66] D.I. 6-9 at 563-568.
[67] *Id.* at 596-601; D.I. 6-10 at 690-700; D.I. 6-14 at 978-984; D.I. 6-15 at 999-1103.

Fawzia Hasan, MD.[68]  The assessments of State Agency Psychiatric Consultants

Christopher King, Psy.D., and Dianne Bingham, Ph.D, were considered by the ALJ.[69]

### a.    Treating Psychiatric Physicians

Dr. Frabizzio diagnosed plaintiff with major depression, severe, with

psychotic features.[70]  She underwent behavioral therapy treatment with Dr. Frabizzio

weekly and/or biweekly since 2012.[71]  In a Mental Impairment Questionnaire completed

by Dr. Frabizzio in June 2014, he reported that plaintiff suffered from memory lapses,

forgets things easily, becomes disorganized, and gets confused.[72]  He further noted that

her symptoms include:  appetite disturbance with weight change; decreased energy;

suicidal thoughts; feelings of guilt or worthlessness; generalized persistent anxiety;

mood disturbance; difficulty thinking or concentrating; persistent disturbances of mood or

affect; apprehensive expectation; emotional withdrawal or isolation; catatonic or other

grossly disorganized behavior; emotional ability; easy distractibility; memory impairment;

and sleep disturbances.[73]  Additionally, in his treatment records from August 2014, Dr.

Frabizzio reported that her depression was greatly exacerbated by her husband's

suicide and suggested that she may be suffering from PTSD.[74]  Dr. Frabizzio's

Psychotherapy Intake Note, dated September 3, 2015, included the following treatment

goals: reduce depression, reduce anxiety, manage pain, and increase social activities.[75]

---

[68] D.I. 6-14 at 985-998.
[69] D.I. 6-2 at 22.
[70] D.I. 6-9 at 596.
[71] *Id.*
[72] *Id.* at 596.
[73] *Id.* at 597.
[74] D.I. 6-10 at 691.
[75] D.I. 6-15 at 999.

Dr. Frabizzio's Psychotherapy Progress Notes starting November 19, 2015 until the last note on January 5, 2017, noted that plaintiff's depression as either "improved" or "improved but vacillates"; anxiety as either "improved" or "improved but vacillates"; increase social outlets as "accomplished"; and manage pain "better but up and down."[76]

Plaintiff was also treated by Fawzia Hasan, M.D., a psychiatrist, for Depressive Disorder and Recurrent Moderate Major Depressive Disorder without suicidal thoughts starting in March 2015.[77]  Her primary care physician had already been treating her with psychiatric medications for her depression including Cymbalta, Ambilify, and Xanax.[78]  Dr. Hasan increased her Cymbalta and Ambilify dosages and advised her not to take Xanax and Ambien daily.[79]  Plaintiff also began various medications for poor sleep due to nightmares of her husband's death.[80]  Dr. Hasan indicated that she was "responding well" to treatment.[81]  In a Progress Note from Dr. Hasan dated October 31, 2016, he reported that she was taking her medications and responding well, and noted that her nightmares had improved since starting new medication.[82]

### 3. State Agency Assessments

#### a.    State Agency Consultants' Physical Assessments

In November 2012, plaintiff underwent a physical consultative examination by Irwin Lifrak, M.D, for her previous application for benefits, which included findings

---

[76] *Id.* at 999-1103; D.I. 16 at 1104-1119; *Id.* at 1176-1210.
[77] D.I. 6-14 at 986.
[78] *Id.*
[79] *Id.* at 987.
[80] *Id*. at 985-998.
[81] *Id*.
[82] *Id.* at 997.

consistent with reduced range of motion, lung impairment, and fatigue.[83]  In August 2014, plaintiff underwent a second consultative examination by Dr. Lifrak.[84]  Plaintiff's oxygen saturation on room air using a pulse oximeter was 96%.[85]  She had a mild degree of rhonchi heard over both lungs, but no rales or wheezing.[86]  Dr. Lifrak's diagnosis included possible restrictive and/or obstructive pulmonary disease, as well as degenerative joint disease and possible disk damage due to reduced range of motion in lumbar spine and both hips; mild degree of paravertebral muscle spasms; and complaints of pain.[87]

Dr. Lifrak opined in both assessments that within an eight-hour work day, plaintiff was able to perform such activities which may require her to walk either indoors or outdoors, climb stairs, and lift ten pounds with either hand on a regular basis.[88]  He further opined that plaintiff is able to sit and/or stand for six hours during an eight-hour work day.[89]

State Agency Consultants Vinod K. Kataria, M.D., and Darrin Campo, M.D., reviewed plaintiff's medical records and made non-examination assessments in November 2014 and August 2015.[90]  Dr. Kataria found that the medical source opinions from plaintiff's treating providers, specifically Drs. Frabizzio and Javed, about the

---

[83] D.I. 6-9 at 555-562.
[84] D.I. 6-11 at 701-708.
[85] *Id.*
[86] *Id.*
[87] *Id.*
[88] D.I. 6-9 at 561; D.I. 6-11 at 701-708.
[89] *Id.*
[90] D.I. 6-3 at 96-111; 114-122.

plaintiff's limitations or restrictions as more restrictive than his own findings.[91]  Regarding both Drs. Frabizzio and Javed's opinions, Dr. Kataria stated "[t]he opinion evidence relied heavily on the subjective report of symptoms and limitations provided by the individual, and the totality of the evidence does not support that opinion."[92]  Dr. Campo subsequently affirmed the decision of Dr. Kataria on August 1, 2015.[93]

Based on these findings, Drs. Kataria and Campo concluded that plaintiff is limited to light work with the following limitations: occasional climbing, balancing, stooping, kneeling, crouching, and crawling; avoidance of concentrated exposure to extreme cold, extreme heat, humidity, vibration, respiratory irritants, and hazards.[94]  They further opined that plaintiff can stand and/or walk for approximately six hours in an eight hour work-day; sit for approximately six hours during an eight hour work day; occasionally able to lift and/or carry twenty-pounds and frequently able to lift and/or carry ten-pounds.[95]

### b.    State Agency Consultants' Psychiatric Assessments

Dr. King performed a non-examining assessment of plaintiff's medical records dated August 13, 2014.[96]  Dr. King evaluated plaintiff under Disability Evaluation Listings 12.04 Affective Disorders and 12.06 Anxiety- Related Disorders.[97]  He found that plaintiff did not meet the criteria set forth under Paragraphs A, B, or C of either listing.[98]  His

---

[91] *Id.* at 109.
[92] *Id.*
[93] *Id.* at 114-122.
[94] *Id.* at 107-108.
[95] *Id.* at 107.
[96] *Id.* at 87-90; *Id.* at 103-109.
[97] *Id.*  at 88.
[98] *Id.*

additional explanation was as follows:

> [c]laimant alleges disability on the basis of physical conditions, depression, and anxiety, and says she is limited by difficulty concentrating, remembering things, and getting along with others. Allegations are partially credible. The records reflects a history of reactive depression and anxiety symptoms related to situational stressors, and she has ben diagnosed with an adjustment disorder and an anxiety disorder. She is prescribed psychotropic medication by her PCP, and her mental condition has remained stable over time. There is no evidence of any significant mental limitations in the MER, and no indication of any deficits in concentration or memory . . . her mental impairment seems to be non-severe.

Further, Dr. King stated that the medical source opinions from plaintiff's treating mental health providers about her limitations or restrictions were more restrictive than his own findings.[99]  On August 3, 2015, Dr. Bingham reviewed plaintiff's medical records since Dr. King's initial assessment and affirmed his findings.[100]

### B.    Hearing Testimony

#### 1.    Plaintiff's Testimony

At the August 2, 2017 hearing, plaintiff testified regarding her background, work history, and alleged disability.[101]  She is widowed, lives alone, and has a son. [102]  She testified that her husband died by suicide in April 2014.[103]  Plaintiff testified that she is currently receiving WIB benefits in the amount of approximately $1,277.00 per month since obtaining age sixty.[104]  She is a college graduate with a bachelors degree in

---

[99] D.I. 6-3 at 109.
[100] *Id.* at 122-124.
[101] D.I. 6-2 at 37-70.
[102] *Id.* at 44-45.
[103] *Id.* at 45.
[104] *Id.* at 46-47.

human resources.[105]

Plaintiff testified that she worked as a human resources manager for Household Finance for seventeen years.[106]  She stated that she managed nine employees and was responsible for human resources for over one-thousand employees.[107]  She testified that her position was sedentary and she was not required to lift more than ten pounds.[108]  She reported that her employment with Household Finance ended because she started her own event planning business.[109]  Plaintiff testified that she was self-employed as an event planner for four to five years, and planned events for clients including United Parcel Service, University of Delaware, and Astrazeneca.[110]  As an event planner, she lifted objects between ten and thirty pounds, including sound equipment, boxes, and chairs.[111]  When her event planning business declined, she sought full-time employment.[112]

Plaintiff subsequently worked at Boeing for seven years as a human resources representative for their V-22 Program.[113]  She described her position as a skilled job in which she was responsible for knowing current Human resource laws, hiring and firing employees, performing investigations, and resolving issues with employee benefits.[114] She reported having difficulty towards the end of her employment with Boeing due to

---

[105] *Id.* at 45.
[106] *Id.* at 47.
[107] *Id.*
[108] *Id.* at 49.
[109] *Id.*
[110] *Id.* at 48.
[111] *Id.*
[112] *Id.*
[113] *Id.* at 46.
[114] *Id.*

problems with memory and retaining information, making mistakes, missing time from work, and difficulty learning new things.[115]  Plaintiff was docked for her attendance.[116]  As a result, she was terminated from Boeing in 2013.[117]  Thereafter, she worked for Avon part-time for two years, until early 2017 when she ended her employment.[118]  She testified that her job responsibilities included scheduling and attending appointments with customers, ordering brochures for upcoming campaigns, and delivering brochures.[119]  Plaintiff's employment with Avon ended because she was unable to deliver brochures in humid and cold weather from COPD.[120]

Plaintiff claimed that at the time of her termination, she had recently been diagnosed with Lupus and Lyme Disease ("Lyme's").[121]  Symptoms related to these conditions of feeling very ill and tired began in 2011 and 2012.[122]  Plaintiff testified that she cannot distinguish the Lupus versus Lyme symptoms; however, she testified that her neurological issues are related to the Lyme's, including forgetfulness.[123]

She reported that in 2016 she underwent Benlysta Infusions for inflammation due to Lupus, consisting of  intravenous infusions once per month.[124]  Following these infusions, she was less tired; her hair loss, photosensitivity to sun, and mouth sores

---

[115] *Id.*
[116] *Id.* at 64.
[117] *Id.* at 46.
[118] *Id.* at 64.
[119] *Id.*
[120] *Id.*
[121] *Id.* at 46.
[122] *Id.* at 50.
[123] *Id.* at 54.
[124] *Id.* at 52.

stopped, and her pain subsided.[125]  She testified that she was currently being treated with prescription medications for Lupus, including Flutamide and Prednisone as needed.[126] Plaintiff reported Lupus causes pain in all of her joints, especially her hands and feet, absent infusions, and she has difficulty using her hands when experiencing a Lupus flare-up.[127]  Her flare-ups lasted three to four days at a time and were constant.[128]

Plaintiff testified that she was treated for COPD.[129]  In describing her COPD symptoms made breathing very difficult when climbing stairs, and heat, humidity, and extreme cold bothered her.[130]  Lifting and carrying objects for any distance caused her to become very winded.[131]

Plaintiff was also treated for depression since her medical diagnoses in 2011,[132] and has undergone behavioral as well as medication treatments.[133]  She testified that she sees a psychologist once a week and a psychiatrist for medication every two to three months.[134] Her depression began because of her Lupus and Lyme's, but increased following her husband's suicide in April 2014.[135]  She alleged that around the time of her diagnoses, she could not do simple things such as housework because of her pain.[136]  Following her

---

[125] *Id.*
[126] *Id.*
[127] *Id.* at 53.
[128] *Id.*
[129] *Id.* at 51.
[130] *Id.*
[131] *Id.*
[132] *Id.* at 55.
[133] *Id.* at 55-61.
[134] *Id.*
[135] *Id.*
[136] *Id.* at 57.

husband's death, she became isolated and neglected her personal hygiene.[137]  Although she is still undergoing treatment with her psychologist and psychiatrist, plaintiff testified that her depression has improved significantly.[138]

The ALJ asked plaintiff about her physical limitations following her Lupus and Lyme diagnoses.[139]  Plaintiff testified that there were no physical tasks that she could not perform while at work; rather, her issues revolved around her mental abilities to perform such tasks.[140]

## 2.     Vocational Expert's Testimony

Initially, the ALJ asked the VE to classify the plaintiff's past work.[141]  The VE testified that past work would be classified as a human resource manager, and classified as sedentary, skilled, SVP 8, with a DOT code of 166.117-018.[142]  Further, the VE testified that an event manager is classified as light work with an SVP of 7, and a DOT code of 169.117-022.[143]

The ALJ then asked the vocational expert  to consider a hypothetical individual of plaintiff's age, education, and work history, and assume that the individual retains a residual functional capacity for light work, but limited to only "occasional postural activities of climbing, balancing, stooping, kneeling, crouching, crawling; and this individual could not tolerate concentrated exposure to temperature extremes, humidity,

---

[137] *Id.* at 58.
[138] *Id.* at 61.
[139] *Id.* at 63.
[140] *Id.*
[141] *Id.*
[142] *Id.*
[143] *Id.*

strong odors, fumes, dust, chemicals, or other respiratory irritants." [144]  The VE testified that such an individual could perform past relevant work.[145]

The second hypothetical by the ALJ was whether past relevant work could be performed if the  Residual Functional Capacity ("RFC"), were sedentary.[146]  The VE testified that the individual could not perform the event manager position.[147]

The third hypothetical by the ALJ was whether past work could be performed if the individual was limited to only simple, routine, and repetitive tasks with only brief and superficial interaction with the public or coworkers.[148]  The VE responded that the individual would be unable to perform any past employment.[149]

## C.    The ALJ's Findings

Based on the medical evidence and testimony presented, the ALJ determined that plaintiff was not disabled and, therefore, ineligible for Social Security Disability Insurance, Supplemental Security Income, and Disabled Widow's Insurance Benefits.[150]  The ALJ's findings are summarized as follows:

1.    Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2018.[151]

2.    Plaintiff is an unmarried widow of the deceased insured worker and has attained the age of fifty.  Therefore, she has met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of

---

[144] *Id.* at 67.
[145] *Id.* at 68.
[146] *Id.*
[147] *Id.*
[148] *Id.*
[149] *Id.*
[150] *Id.* at 14-27.
[151] *Id.* at 14.

the Social Security Act.[152]

3.      The prescribed period ended on October 31, 2016.[153]

4.      Plaintiff has not engaged in substantial gainful activity during the period from her alleged onset date of May 7, 2013 through her date last insured of December 31, 2018 (20 C.F.R. 404.1571 *et seq.*).[154]

5.      Plaintiff has the following severe impairments:  Chronic Obstructive Pulmonary Disease ("COPD"); Systematic Lupus Erythematosus; Fibromyalgia; and Polyarthralgia (20 C.F.R. 404.1520(c)).[155]

6.      Through the last date insured, plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, and 404.1526).[156]

7.      Through the last date insured, plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) with the following limitations:  only occasional climbing, balancing, stooping, kneeling, crouching, and crawling.  Additionally, plaintiff is limited to work that does not involve concentrated exposure to temperature extremes, humidity, strong odors, fumes, dusts, chemicals, or other respiratory irritants.[157]

8.      Plaintiff is able to perform past relevant work as a human resource manager and event manager.  This work did not require the performance of work related activities precluded by plaintiff's residual functional capacity (20 C.F.R. 404.1565).[158]

9.      Plaintiff is not under a disability, as defined by the Social Security Act, from May 7, 2013, through September 7, 2017. (20 C.F.R. 404.1520(F)).[159]

Consequently, based on the application for a period of disability and disability

---

[152] *Id.* at 15.
[153] *Id.*
[154] *Id.*
[155] *Id.*
[156] *Id.* at 17.
[157] *Id.* at 18.
[158] *Id.* at 26.
[159] *Id.* at 27.

insurance benefits, the ALJ found that plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act.[160]  The ALJ also concluded, based on the application for disabled widow's benefits, plaintiff was not disabled under sections 202(e) and 223(d) of the Social Security Act.[161]

## III.    STANDARD OF REVIEW

### A.    Motion for Summary Judgment

Both parties moved for summary judgment.[162]  In determining the appropriateness of summary judgment, the court must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the nonmoving party[,]' but [refraining from] weighing the evidence or making credibility determinations."[163]  If there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, summary judgment is appropriate.[164]

This standard does not change merely because there are cross-motions for summary judgment.[165]  Cross-motions for summary judgment:

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.[166]

---

[160] *Id.*

[161] *Id.*

[162] D.I. 12; D.I. 20.

[163] *Reeves v. Sanderson Plumbing, Prods., Inc.*, 530 U.S. 133, 150 (2000).

[164] *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting FED. R. CIV. P. 56(c)).

[165] *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).

[166] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

"The filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party."[167]

## B.    Court's Review of the ALJ's Findings

Section 405(g) sets forth the standard of review of the ALJ's decision by the district court.  The court may reverse the Commissioner's final determination only if the ALJ did not apply the proper legal standards, or the record did not include substantial evidence to support the ALJ's decision.  The Commissioner's factual decisions are upheld if supported by substantial evidence.[168]  Substantial evidence means less than a preponderance of the evidence, but more than a mere scintilla of evidence.[169]  As the United States Supreme Court has found, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[170]

In determining whether substantial evidence supports the Commissioner's findings, the court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record.[171]  The court's review is limited to the evidence that was actually presented to the ALJ.[172]  The Third Circuit has explained that a:

[s]ingle piece of evidence will not satisfy the substantiality test if the

---

[167] *Krupa v. New Castle County*, 732 F. Supp. 497, 505 (D. Del. 1990).
[168] 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Med. Ctr. v.Heckle*, 806 F. 2d 1185, 1190 (3d Cir. 1986).
[169] *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005).
[170] *Pierce v. Underwood*, 487 U.S. 552, 565 (1988); *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).
[171] *Monsour*, 806 F.2d at 1190.
[172] *Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001).

[Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence, particularly certain types of evidence (e.g., evidence offered by treating physicians) or if it really constitutes not evidence but mere conclusion.[173]

Thus, the inquiry is not whether the court would have made the same determination, but rather, whether the Commissioner's conclusion was reasonable.[174] Even if the court would have decided the case differently, it must defer to the ALJ and affirm the Commissioner's decision so long as the decision is supported by substantial evidence.[175]

Where "review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision."[176]  In *Securities & Exchange Commission v. Chenery Corp.*, the Supreme Court found that a "reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.  If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."[177]  The Third Circuit has recognized the applicability of this finding in the Social Security disability context.[178]  Thus, this court's review is limited to the four corners of the ALJ's

---

[173] *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).
[174] *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988).
[175] *Monsour*, 806 F.2d at 1190-91.
[176] *Hansford v. Astrue*, 805 F. Supp. 2d 140, 144-45 (W.D. Pa. 2011).
[177] *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947).
[178] *Fargnoli v. Massanari*, 247 F.3d 34, 44, n.7 (3d Cir. 2001).

decision.[179]

## C. ALJ's Disability Determination Standard

The Supplemental Social Security Income (SSI) program was enacted in 1972 to assist "individuals who have attained the age of 65 or are blind or disabled" by setting a minimum income level for qualified individuals.[180] A claimant – in order to establish SSI eligibility – bears the burden of proving that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of or not less than twelve months."[181] Moreover, "the physical or mental impairment or impairments must be of such severity that the claimant is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in significant numbers in the national economy."[182] A "physical or mental impairment" results from anatomical, physiological, or psychological abnormalities which are evidenced by medically acceptable clinical and laboratory diagnostic techniques.[183]

### 1. Five-Step Test.

The Social Security Administration uses a five-step sequential claim evaluation process to determine whether an individual is disabled.[184]

---

[179] *Cefalu v. Barnhart*, 387 F. Supp. 2d 486, 491 (W.D. Pa. 2005).
[180] *Sullivan v. Zebley*, 493 U.S. 521, 524 (1990) (citing 42 U.S.C. § 1381 (1982)).
[181] 42 U.S.C. § 423(d)(1)(A).
[182] 42 U.S.C. § 423(d)(2)(A).
[183] 42 U.S.C. § 423(d)(3).
[184] 20 C.F.R. § 416.920(a); *see also Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999).

In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. If a claimant is found to be engaged in substantial activity, the disability claim will be denied.

In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. If the claimant fails to show that her impairments are "severe", she is ineligible for disability benefits.

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.

Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. The claimant bears the burden of demonstrating an inability to return to her past relevant work. If the claimant is unable to resume her former occupation, the evaluation moves to the final step.

At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled. The ALJ will often seek the assistance of a vocational expert at this fifth step.[185]

If the ALJ determines that a claimant is disabled at any step in the sequence, the analysis ends.[186]

## 2. Weight Afforded Treating Physicians

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight."[187] Moreover, such reports will be

---

[185] *Plummer*, 186 F.3d at 427.
[186] 20 C.F.R. § 404.1520(a).
[187] *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000).

given controlling weight where a treating source's opinion on the nature and severity of a claimant's impairment is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence on record.[188]

The ALJ must consider medical findings supporting the treating physician's opinion that the claimant is disabled.[189] It is error, however, to apply controlling weight to an opinion merely because it comes from a treating source if it is not well-supported by the medical evidence, or inconsistent with other substantial evidence, medical or lay, in the record.[190] If the ALJ rejects the treating physician's assessment, he may not make "speculative inferences from medical reports," and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence."[191] Further, medical testimony from a doctor who has never examined the claimant should not be given credit if it contradicts the testimony of the claimant's treating physician.[192] If the ALJ does not give a physician's report controlling weight, he must examine multiple factors.[193] These factors include the "[e]xamining relationship," the "[t]reatment relationship" which considers the "[l]ength of the treatment relationship and the frequency of examination," the "[n]ature and extent of the treatment relationship," the degree and extent the relevant evidence supports a treating physician's opinion, the

---

[188] *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).
[189] *Morales*, 225 F.3d at 317 (citing *Plummer*, 186 F.3d at 429).
[190] SSR 96-2p, 1996 WL 374188 at *2.
[191] *Plummer*, 186 F.3d at 429.
[192] *Dorf v. Bowen*, 794 F.2d 896, 901 (3d Cir. 1986).
[193] 20 C.F.R. §404.1527(c).

consistency of the opinion with the record as a whole, and the specialization of the treating physician in relation to the medical issues involved.[194] An ALJ must weigh all the evidence in the record.[195] Failure of an ALJ to examine and elaborate on these factors is grounds for remand.[196]

### 3. Evaluation of Subjective Accounts of Pain[197]

Statements about the symptoms alone never establish the existence of any impairment or disability.[198] The Social Security Administration uses a two-step process to evaluate existence and severity of symptoms.

### a. Step One, Existence of Pain

First, the ALJ must find a medically determinable impairment – proven with medically acceptable clinical and laboratory diagnostic data – that could reasonably be expected to produce the claimant's symptoms. Otherwise, the ALJ cannot find the applicant disabled, no matter how genuine the symptoms appear to be.

This step does not consider the intensity, persistence, and limiting effects of the symptoms on the claimant: it only verifies whether a medical condition exists that could objectively cause the existence of the symptom.

Analysis stops at this step where the objectively determinable impairment meets

---

[194] *Id.*

[195] *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000).

[196] *Solomon v. Colvin*, C.A. No. 12-1406-RGA-MPT, 2013 WL 5720302, at *12 (D. Del. Oct. 22, 2013).

[197] *See* 20 C.F.R §§ 416.928-29; *see also* SSR 96-7p.

[198] A symptom is an individual's own description of physical or mental impairments such as pain, fatigue, shortness of breath and other complaints. *See* SSR 96-7p.

or medically equals one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, because the claimant is considered disabled *per se*.

### b. Step Two, Severity of Pain

At step two, the ALJ must determine the extent to which the symptoms limit the claimant's ability to do basic work activities. At this step, the ALJ must consider the entire record, including medical signs, laboratory findings, the claimant's statements about symptoms, any other information provided by treating or examining physicians and psychologists, and any other relevant evidence in the record, such as the claimant's account of how the symptoms affect her activities of daily living and ability to work.[199]

Where more information is needed to assess a claimant's credibility, the ALJ must make every reasonable effort to obtain available information that would shed light on that issue. Therefore, the ALJ must consider the following factors relevant to symptoms, only when such additional information is needed:

(i)  The applicants' account of daily activities;

(ii)  The location, duration, frequency, and intensity of pain or other symptoms;

(iii)  Precipitating and aggravating factors;

(iv)  The type, dosage, effectiveness, and side effects of any medication the applicant takes or has taken to alleviate pain or other symptoms;

(v)  Treatment, other than medication, the applicant receives or has received for

---

[199] 20 C.F.R. § 404.1529.

27

relief of pain or other symptoms;

(vi)  Any measures the applicant uses or has used to relieve pain or other symptoms (e.g., lying flat, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii)  Other factors concerning functional limitations and restrictions due to pain or other symptoms.[200]

### 4.      Factors in Evaluating Credibility[201]

A claimant's statements and reports from medical sources and other persons with regard to the seven factors noted above, along with any other relevant information in the record, provide the ALJ with an overview of the subjective complaints, and are elements to the determination of credibility.

Consistency with the record, particularly medical findings, supports a claimant's credibility.  Since the effects of symptoms can often be clinically observed, when present, they tend to lend credibility to a claimant's allegations.  Therefore, the adjudicator should review and consider any available objective medical evidence concerning the intensity and persistence of pain or other symptoms in evaluating the claimant's statements.

Persistent attempts to obtain pain relief, increasing medications, trials of different types of treatment, referrals to specialists, or changing treatment sources may indicate that the symptoms are a source of distress and generally support a claimant's

---

[200] 20 C.F.R. § 404.1529
[201] SSR 16-3p.

allegations.  An applicant's claims, however, may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show noncompliance with prescribed treatment.

Findings of fact by state agency medical and psychological consultants and other physicians and psychologists regarding the existence and severity of impairments and symptoms, and opinions of non-examining physicians and psychologist are also part of the analysis.  Such opinions are not given controlling weight.  However, the ALJ, although not bound by such findings, may not ignore them and must explain the weight afforded those opinions in his decision.

Credibility is one element in determining disability.  The ALJ must apply his finding on credibility in step two of the five-step disability determination process, and may use it at each subsequent step.

The decision must clearly explain – provide sufficiently specific reasons based on the record – to the claimant and any subsequent reviewers, the weight afforded to the claimant's statements and the reasons therefore.

The law recognizes that the claimant's work history should be considered when evaluating the credibility of her testimony or statements.[202]  A claimant's testimony is accorded substantial credibility when she has a long work history, which demonstrates it is unlikely that, absent pain, she would have ended employment.[203]

---

[202] 20 C.F.R. § 404.1529(a)(3).

[203] *Podedworny v. Harris*, 745 F.2d 210, 217 (3d Cir. 1984) (citing *Taybron v. Harris*, 667 F.2d 412, 415 n.6 (3d Cir. 1981)).  In *Podedworny*, the claimant worked for thirty-two years as a crane operator for one company.  He had a ninth grade education

### 5. Medical Expert Testimony

An ALJ will consider opinions about medical equivalence from a physician or psychologist designated by the Commissioner whenever a claimant is not engaging in substantial gainful activity and has a severe impairment(s) that does not "meet" the requirements of a listing.[204]  Medical equivalence exists when:

• Signs, symptoms, and laboratory findings are not identical to those specified in a listed impairment, but are of equivalent severity;
• Signs, symptoms, and laboratory findings are equivalent in severity to those of the most closely analogous listed impairment; or
• The combination of signs, symptoms, and laboratory findings are equivalent in severity to the criteria of a listed impairment.[205]

An ALJ must obtain ME testimony specific to the issue of medical equivalence if he or she intends to find that the claimant equals the requirements of a listing.[206]  An ALJ may not ask an ME to decide whether the claimant is disabled.[207]

## IV.  DISCUSSION

### A.  Parties Contentions

#### 1.  Plaintiff's Contentions

In her appeal, plaintiff contends that the ALJ failed to apply the proper standard and therefore, incorrectly concluded that her mental impairments are non-severe.[208]

---

and left his employment after the company physicians determined that his symptoms of dizziness and blurred vision prevented him from safely performing his job.
[204] HALLEX § I-2-6-70; See 20 CFR 404.1526, 416.926, and SSR 17-2p.
[205] *Id.*
[206] *Id.; See* SSR 86-8 and SSR 17-2p.
[207] *Id.*
[208] D.I. 12 at 2.

Plaintiff claims that the ALJ's finding is not supported by substantial evidence in regards to step two of the five-step sequential evaluation process to determine whether an individual is disabled.[209]

Plaintiff argues that the ALJ failed to apply the step two standard; failed to properly consider the opinion of her treating psychologist; failed to consider the entirety of the medical records and her own testimony regarding her mental impairments; and therefore, failed to properly account for her impairments in the RFC.[210]

Plaintiff contends that the ALJ failed to evaluate all of the treating source opinions in accordance with the regulations, Agency policy, and Third Circuit precedent.[211]  Specifically, plaintiff argues that the ALJ incorrectly relied upon the opinion of consultative examiner Ramnik Singh, MD, as well as the opinions of State Agency Psychological Consultants.[212]  In support of her contentions, she alleges that Dr. Singh's opinion was rendered several months prior to her alleged onset date and eighteen months prior to her husband's suicide, which had a significant effect on her mental functioning.[213]  Furthermore, she notes neither the State Agency consultants, nor Dr. Singh, reviewed her treating physician's 2016 opinion or most of her mental health treatment records since her husband's suicide.[214]

Regarding her mental impairments, she argues that the ALJ incorrectly gave her

---

[209] *Id.*
[210] *Id.* at 2-3.
[211] *Id.* at 14.
[212] *Id.* at 9.
[213] *Id*.
[214] *Id*.

treating psychologist's opinion little weight.[215]  Plaintiff claims that the ALJ's conclusion that her treating psychologist's opinion was "not supported by the treatment record or the claimant's own report of mental functioning" was highly selective and overlooked evidence to the contrary.[216]  In reference to her physical impairments, plaintiff argues that the ALJ erred by rejecting the opinions of her treating physicians; specifically, that the ALJ rejected the opinions based on a highly selective review of the medical evidence on record and failed to set forth the factors required by 20 C.F.R. § 404.1527(c).  Finally, plaintiff contends that the ALJ's errors in weighing the evidence resulted in a legally insufficient RFC finding and therefore should be reversed and remanded to the Agency for further proceedings.[217]

### 2. Defendant's Contentions

Defendant maintains that substantial evidence supports the ALJ's finding that plaintiff's anxiety and depression are non-severe as per 20 C.F.R. § 404.1520a(d)(1).[218]  In support of this contention, defendant outlines the four areas considered to evaluate the severity of mental impairments,[219] and contends that plaintiff has only mild limitations regarding her capacity for understanding, remembering, or applying information; capacity for concentrating, persisting, or maintaining pace; and capacity for adapting or managing herself.[220]  Additionally, defendant argues that the facts in the

---

[215] *Id.* at 10.
[216] *Id.*
[217] *Id.* at 10-28.
[218] D.I. 20 at 9.
[219] 20 C.F.R. § 404.1520a(c)(3).
[220] D.I. 20 at 10-11.

record evidence that plaintiff was only mildly limited in the category of interacting with others.[221]

Defendant further contends that the ALJ properly weighed the opinion evidence and granted little weight to the opinions of Drs. Javed, Mancilla, Vasile, and Frabizzio.[222] Specifically, defendant argues that the ALJ correctly weighed the opinion evidence of Dr. Frabizzio because his assessments were not supported by the treatment records nor plaintiff's own statements.[223] Defendant also asserts that the opinions of Drs, Javed, Mancilla, Vasile, and Biasotta were properly weighed under the Agency's regulations and rulings.[224]

Finally, defendant maintains that substantial evidence supports the ALJ's RFC finding.[225] Defendant contends that the ALJ did in fact consider plaintiff's non-severe impairments when formulating her RFC.[226] Therefore, according to defendant, the ALJ's conclusion was correct, with substantial evidence in support of the conclusion that plaintiff's mild limitations in the broad areas of mental functioning did not translate to a work-related functional limitation, and as a result, the decision should be affirmed.

### B. Disability Analysis

Title II of the Act, 42 U.S.C. § 423(a)(I)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from

---

[221] *Id.* at 11-12; *see* 20 C.F.R. § 404.1520a(c)(3).
[222] *Id.* at 14.
[223] *Id.* at 15.
[224] *Id.* at 16-18.
[225] *Id.* at 18.
[226] *Id.*

a physical or mental disability."[227]  To qualify for DIB, a claimant must establish disability

prior to the date she was last insured.[228]  A "disability" is defined as the inability to do

any substantial gainful activity because of any medically determinable physical or

mental impairment, which either could result in death or has lasted or can be expected

to last for a continuous period of at least 12 months.[229]  To be disabled, the severity of

the impairment must prevent return to previous work, and based on age, education, and

work experience, restrict "any other kind of substantial gainful work which exists in the

national economy."[230]

     In determining whether a person is disabled, the Commissioner is required to

perform a five-step sequential analysis.[231]  If a finding of disability or non-disability can

be made at any point in the sequential process, the review ends.[232]  When a claimant's

impairment or its equivalent matches an impairment in the listing, the claimant is

presumed disabled.[233]  The Commissioner also determines whether the claimant retains

the RFC to perform her past relevant work.[234]  A claimant's RFC is "that which an

individual is still able to do despite limitations caused by [her] impairment(s)."[235]  For

steps one through four, the burden rests on the claimant to prove.[236]

---

[227] *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).
[228] *See* 20 C.F.R. § 404.131.
[229] 42 U.S.C. §§ 423(d)(I)(A), 1382(c)(a)(3).
[230] 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).
[231] 20 C.F.R § 404.1520; see also *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3dCir. 1999).
[232] 20 C.F.R. § 404.1520(a)(4).
[233] 20 C.F.R. § 404.1520(a)(4)(iii).
[234] 20 C.F.R. § 404.1520(a)(4)(iv); *Plummer*, 186 F.3d at 428.
[235] *Fargnoli*, 247 F.3d at 40.
[236] *Plummer*, 186 F.3d at 428.

At the fifth and final step, the Commissioner must show the claimant is capable of performing other available work existing in significant national numbers and consistent with the claimant's medical impairments, age, education, past work experience, and RFC before denying disability benefits.[237]  In making this determination, the ALJ must analyze the cumulative effect of all the claimant's impairments and often seeks the assistance of a vocational expert.[238]

### 1.    Weight Accorded to Medical Opinion Evidence

It is the exclusive responsibility of the ALJ to weigh the evidence in the record as a whole in making a disability decision.[239]  The evidence presented to the ALJ may contain differing medical opinions from both treating and non-treating physicians, as well as other testimony.[240]  Normally, the evidence presented by the treating physician is given controlling weight as that individual may be most acquainted with the medical history of the claimant.  However, in circumstances where the treating physician's opinion is not consistent with the record as a whole or is not well supported by "medically acceptable clinical and laboratory diagnostic techniques", an ALJ may reasonably accord little weight to the treating physician's opinion.[241]

In the present case, the ALJ considered the medical opinions of plaintiff's specialists:  Drs. Javed, Mancilla, Vasile, Frabizzio, and Biasotta.  Additionally, the ALJ also considered the opinions of non-examining State Agency Medical Consultants, Drs.

---

[237] *Plummer*, 186 F.3d at 427-28.
[238] *Id.*
[239] See 20 C.F.R. 404.1527(e)(2).
[240] See 20 C.F.R. 404.1512.
[241] See 20 C.F.R. 404.1527.

Campo and Kataria, and Physical Consultative Examiner Dr. Lifrak. The ALJ also considered non-examining State Agency Psychiatric Consultants, Drs. King, Bingham, and Singh.[242]

### a. Treating Physicians

### i. Dr. Biasotta

The ALJ correctly afforded little weight to the opinion of Dr. Biasotta, plaintiff's primary care physician.[243] As the ALJ noted, although Dr. Biasotta was able to observe and examine plaintiff firsthand, as a primary care physician, Dr. Biasotta "lacks the training and medical knowledge retained by a more specialized provider."[244] The ALJ pointed out that Dr. Biasotta's assessment was provided in checklist style format with limited explanation or support.[245] As defendant correctly argues, "form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best,"[246] and are therefore not entitled great weight. Finally, the ALJ explained that Dr. Biasotta's assessment occurred in July 2012, almost one year prior to the plaintiff's alleged onset date,[247] which is inconsistent with the ALJ affording great weight to Dr. Singh's opinion, that occurred several months prior to the plaintiff's alleged onset date and eighteen months before to her husband's death. "[Evidence that] may be material to a claim for disability [includes] [e]vidence dated within 12 months of the alleged onset

---

[242] D.I. 7-2 at 25.
[243] D.I. 6-2 at 23.
[244] *Id.*
[245] *Id.*
[246] *Mason v. Shalala,* 994 F.2d 1058, 1065 (3d Cir. 1993)(citations omitted).
[247] D.I. 6-2 at 23.

date under a title II application."[248]  Therefore, the ALJ erred when rejecting Dr.

Biasotta's conclusions based on the date of examination.  Nevertheless, the ALJ's

consideration of the evidence and remaining factors as to the weight afforded complied

with the regulations.  Thus, little weight was properly given to the opinion of Dr.

Biasotta.

### ii.    Dr. Mancilla

The ALJ properly afforded little weight to the opinion[249] of plaintiff's treating

physician, Dr. Mancilla, because her limitations were not supported by the treatment

record, and her opinion was in check list format with no explanation or supporting

documentation.[250]  The ALJ noted that "plaintiff reported improvement with treatment

and her examinations included minimal range of motion, tenderness, or breathing

abnormalities that would support such extreme limitations."[251]  Furthermore, the ALJ

cited Dr. Mancilla's office visit note from April 2017 where plaintiff denied fatigue,

breathing difficulties, anxiety, depression, insomnia, or memory loss, and reported

feeling well.[252]  Additionally, the ALJ found that according to Dr. Mancilla's examination

report, plaintiff presented with normal chest and lung findings, normal gait, and normal

---

[248] 1993 WL 643036 (last updated May 1, 2017).
[249] Dr. Mancilla provided the following work related limitations:  never lift; rarely stand or walk; occasionally sit; occasionally use arms hands, fingers; constantly recline and elevate feet; needs to alternate positions (sitting and standing) at will; able to perform sedentary work two hours per work day; and able to perform light work less than two hours per work day.  D.I. 6-2 at 24.
[250] D.I. 6-2 at 25 citing 6-16 at 1215.
[251] *Id.* at 25.
[252] *Id.* citing 6-17 at1265-1274.

neuropsychiatric findings.[253]   Therefore, the ALJ correctly weighed the opinion of Dr.

Mancilla and properly afforded little weight to her opinion.

### iii.    Dr. Javed

The ALJ gave little weight to the opinion[254] of Dr. Javed, plaintiff's rheumatology

specialist, because his limitations were not supported by the record.[255]   The ALJ

considered Dr. Javed's March 2014 and March 2017 assessments, and stated

"[d]espite providing essentially identical limitations in March 2014 and March 2017, Dr.

Javed noted in November 2015, March 2016, and July 2016 that the claimant was

doing well, Benlysta had "really helped," and she was "doing fine."[256]   As the ALJ

explained, Dr. Javed's "examination reports over this period note that the claimant

presented with generally normal range of motion testing with minimal tenderness noted

during muskuloskeletal examinations."[257]   However, ample evidence in the record

including objective medical evidence, as well as, subjective accounts of pain and

extensive list of pain medications suggest otherwise.   It appears that the ALJ

---

[253] *Id.*

[254] Dr. Javed opined in March 2014 that plaintiff had the following limitations: able to stand and/or walk no longer than fifteen to twenty minutes at a time; able to sit no longer than one hour at a time; need unscheduled breaks one to two times per day for fifteen to twenty minutes to lie down, elevate legs, or walk around; suffers from moderate to severe pain; pain or other symptom interfere with her ability to complete an eight hour day; able to occasionally twist, stoop, crouch/squat, climb ladders, climb stairs, reach, handle, finger, feel, and push/pull; and emotional factors contribute.   In March 2017, Dr. Javed provided a second assessment which included the same limitations in the March 2014 assessment, as well as, an added limitation of needing to lie down and elevate legs one to two hours per work day.  D.I. 6-2 at 24, citing D.I. 6-16 at 1174-75.

[255] D.I. 6-2 at 23-24.

[256] *Id.* citing D.I. 6-14 at 936-954.

[257] *Id.*

discredited plaintiff's subjective accounts of pain without explicitly discussing her credibility.  Additionally, the ALJ failed to address the factors set forth in 20 C.F.R. §404.1527(c) in discrediting Dr. Javed's opinion.  Therefore, the ALJ improperly weighed the opinion evidence of Dr. Javed.

### iv.    Dr. Vasile

The ALJ afforded little weight to plaintiff's treating pulmonologist, Dr. Vasile's opinion[258],  because the restrictions are unsupported by the treatment record, specifically, diminished standing, walking, and lifting ability as well as absenteeism restrictions.[259]  In support of his finding, the ALJ asserted that plaintiff's COPD remained generally stable over the period of alleged disability with her providers noting normal lung examinations throughout this time.[260]  The ALJ further stated "in 2016, the claimant reported that her dyspnea only occurred with climbing steps and indicated that after joining a hiking group, her exercise tolerance had improved.  Although the claimant did report some deterioration in her breathing in December 2016, according to a follow up visit in April 2017, she remained active and reported only 'mild' increase in her

---

[258] Dr. Vasile opined that plaintiff had the following limitations:  able to sit for more than two hours at one time; able to stand for one hour at a time; able to sit for at least six hours per workday; able to stand/walk for approximately four hours per work day; needs unscheduled breaks during an eight hour working shift depending on breathing; occasionally lift/carry less than ten pounds, rarely lift/carry ten pounds, and never lift/carry twenty pounds; occasionally twist and crouch/squat; rarely stoop; never climb ladders ir stairs; avoid even moderate exposure to extreme cold, high humidity, cigarette smoke, solvents/cleaners, and fumes, odors, and gases; avoid concentrated exposure to extreme heat, perfumes, soldering fluxes, dust, and chemicals; and will likely be absent from work as a result of impairments or treatment approximately two days per month.  D.I. 6-14 at 973-977.
[259] D.I. 6-2 at 24.
[260] *Id.*

dyspnea."[261]  However, Exhibit 46F, on which the ALJ relied on for his determination, also noted that plaintiff has "significant nocturnal hypoxemia.  This is likely on the basis of COPD in addition to sleep apnea.  She cannot tolerate CPAP.  Nocturnal oxygen will be set up."[262]  Moreover, Dr. Vasile indicated that nocturnal oximetry testing in May 2013 revealed that plaintiff's oxygen saturation was less than 90% for over six hours, and in December 2015 decreased to 88% for over two hours.[263]

The ALJ did not rely on the State Agency Consultants assessments in rejecting this evidence:  the State Agency Consultants did not review these records for their assessments.  State Agency Consultants, whose opinions were afforded significant weight, were rendered more than a year before Dr. Vasile's assessment which the ALJ cited, and more than three years before the hearing.  Thus, the ALJ's findings of diminished standing, walking and lifting ability, and absenteeism restrictions were either based on his own lay opinion or on the opinions of the State Agency Consultants who did not review plaintiff's pulmonary records from Dr. Vasile.  Finally, in his explanation why Dr. Vasile's opinion should not receive significant or controlling weight, the ALJ failed to consider the factors set forth in 20 C.F.R. §404.1527(c).  As plaintiff argues, the ALJ erred by either not considering or expanding upon the examining relationship, treatment relationship, length of treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability, consistency, and/or

---

[261] *Id.*
[262] D.I. 6-17 at 1240.
[263] *Id.*

40

specialization.[264]  Although this does not re-weigh the medical opinions in the record, it must determine whether substantial evidence supports the ALJ's weighing of such opinions.[265]  Thus, the ALJ's erred in applying little weight to Dr. Vasile's opinion.

### v.  Dr. Frabizzio

The ALJ afforded little weight to Dr. Frabizzio's opinion because his assessments were not supported by the treatment record or plaintiff's own reporting of mental functioning.[266]  Plaintiff argues that the ALJ erred in the weight attributed to Dr. Frabizzio's opinion because the ALJ's analysis of the psychiatric treatment record was highly selective, overlooking contradictory evidence in favor of plaintiff.[267]  However, the ALJ, by citing various exhibits throughout the record, stated that plaintiff "reported generally normal mental functioning in her function report, and she presented cooperative with appropriate mood and affect and normal judgment with no anxiety or depression noted during the period of alleged disability."[268]  Additionally, the ALJ relied on evidence of Dr. Frabizzio's treatment notes which provided "the claimant's symptoms improved with therapy and medication treatment, and her symptoms were the result of bereavement and situational stressors," which was consistent with the record.[269]  Finally, the ALJ found that plaintiff's medically determinable impairments

---

[264] 20 C.F.R. § 404.1527.
[265] *Tomlinson v. Saul*, No. 18-859 (MN), 2019 U.S. Dist. LEXIS 163787, at *33 (D. Del. Sept. 25, 2019).
[266] D.I. 6-2 at 23.
[267] D.I. 12 at 11.
[268] D.I. 6-2 at 23.
[269] *Id.*

could reasonably be expected to cause her alleged symptoms.[270]  Although her statements regarding the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the evidence,[271] the  finds that there is substantial evidence to support the ALJ's decision, and therefore, the ALJ did not err in granting Dr. Frabizzio's opinion little weight.

### b.    State Agency Consultants

In deciding that plaintiff could perform light work, the ALJ gave significant weight to the non-examining medical opinions of the State Agency Consultants:  Dr. Kataria's opinion dated November 10, 2014, and Dr. Campo's opinion dated August 1, 2015.[272] Drs. Kataria and Campo opined that plaintiff could perform light work with the following limitations:  occasional climbing, balancing, stooping, kneeling, crouching, and crawling; and avoidance of concentrated exposure to extreme cold, extreme heat, humidity, vibration, respiratory irritants, and hazards.[273]  The ALJ also gave significant weight to the examining opinions of Dr. Lifrak dated November 26, 2012,[274] and August 25, 2014.[275]  However, as noted previously, the opinions of Drs, Kataria, Campo, and Lifrak were rendered prior to the relevant pulmonary findings by Dr. Vasile, and therefore should not have been accorded controlling weight.

The ALJ properly gave the State Agency Psychological Consultants' opinions

---

[270] *Id.* at 25.
[271] *Id.* at 25-26.
[272] D.I. 6-3.
[273] *Id.*
[274] D.I. 6-9 at 555-562.
[275] D.I. 6-11 at 701-708.

great weight because "they have a high level of understanding of the Social Security disability program and enjoy review of all the available evidence in the record when forming their opinion."[276]  Drs. King and Bingham opined that plaintiff's mental impairments cause no more than minimal, work-related limitations were therefore non-severe.[277]  Similarly, Dr. Singh determined that plaintiff has no more than mild limitations in her capacity for work related tasks due to her mental impairments.**[278]**  However, as plaintiff correctly argues, Dr. Singh's opinion was rendered prior to plaintiff's alleged onset date and eighteen months prior to her husband's suicide which greatly effected her psychological health.  Accordingly, the ALJ improperly afforded Dr. Singh's opinion great weight.

### 2.    The ALJ's RFC Finding

Plaintiff alleges the ALJ erred in his RFC determination because the opinions of her treating specialists establish greater limitations than set forth in the RFC.[279]  An RFC establishes what an individual can do in a work setting despite impairments and limitations.[280]  In making this finding, the ALJ must consider all of a claimant's impairments, including those lacking severity.[281]  Although the ALJ may weigh the credibility of the evidence, he must indicate the evidence which is rejected and his reason(s) for discounting such evidence.[282]  All evidence in the record must be

---

[276] D.I. 6-2 at 23.
[277] *Id.*
[278] *Id.*
[279] D.I. 16 at 5.
[280] 20 C.F.R. § 404.1545.
[281] *Id.*
[282] *See Plummer*, 186 F.3d at 429.

considered: however, the ALJ has the exclusive responsibility for determining an individual's RFC.[283]

Here, the ALJ found that through the date last insured, plaintiff had the residual functional capacity to perform light work as defined by 20 C.F.R. § 404.1567(b), with the following limitations: only occasional climbing, balancing, stooping, kneeling, crouching, and crawling.[284] Additionally, he held that plaintiff was limited to work that does not involve concentrated exposure to temperature extremes, humidity, strong odors, fumes, dust, chemicals, or other respiratory irritants.[285] Further, the ALJ determined plaintiff capable of performing past relevant work as a human resource manager and event manager, as actually and generally performed in the national economy.[286] Plaintiff argues that vocational testimony based on an inaccurate RFC is not substantial evidence supporting an ALJ's denial of benefits.[287] The court agrees, because as previously noted, the ALJ erred in his consideration of and weight afforded to the medical opinion evidence under 20 C.F.R. § 404.1527.

## V.    CONCLUSION

Therefore, Plaintiff's Motion for Summary Judgment (D.I. 11) is granted, and Defendant's Motion for Summary Judgment (D.I. 19) is denied.

---

[283] 20 C.F.R. § 404.1527(d)(2).
[284] D.I. 6-2 at 18.
[285] *Id.*
[286] *Id.* at 27.
[287] D.I. 11 at 11.

For the reasons stated herein, the ALJ's decision is reversed and remanded for further administrative proceedings consistent with this opinion.

An order consistent with the findings in this Memorandum shall follow.

Date: December 2, 2019          /s/ Mary Pat Thynge      
                                            Chief U.S. Magistrate Judge